Public Utilities Commission, } No. 4141.
    Jan. 6, 1953.

CHICOPEE MANUFACTURING COMPANY & a.

*v.*

PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE.

8

*McLane, Davis, Carleton & Graf* and *Stanley M. Brown* (*Mr. Brown* orally), for the plaintiffs.

*Sulloway, Piper, Jones, Hollis & Godfrey* (*Mr. Hollis* orally), for the defendant.

*H. Thornton Lorimer* and *Francis E. Perkins* (*Mr. Lorimer* orally), for the State of New Hampshire.

KENISON, C. J. 1. REPRODUCTION COST EVIDENCE. In the opening statement on behalf of the company the following offer of proof was made: "In previous hearings the net investment rate base theory has been the only theory advanced or employed. The Company will present evidence to permit such a rate base determination and will point out in connection therewith that this least favorable method of approach justifies the proposed rates because they will produce revenues which are no more than just or reasonable. However, the net investment rate base is not the only approach to the determination of the right answers. For this reason, the Company intends to present some evidence bearing on the current cost of replacing its present property." After consideration of this offer of proof the commission declined to accept reproduction cost evidence. The company claims this is an unconstitutional denial of due process of law.

It is not disputed that evidence of reproduction cost is one method of determining value or valuation of the company's plant and under some circumstances may be a helpful guide in arriving at this determination. However, reproduction cost has been regarded

with some scepticism by regulatory agencies for several years. *Panhandle Eastern Pipe Line Co.* v. *Federal Power Commission,* 324 U. S. 635. In certain cases it may be disregarded entirely. *Colorado Interstate Co.* v. *Federal Power Commission,* 324 U. S. 581, 604; *Market Street Railway Co.* v. *Railroad Commission of California,* 324 U. S. 548, 567. If the commission had allowed the evidence, solemnly considered it and then rejected it, the company could have no complaint. It would appear to be pointless and unrewarding for this court to require the commission to spend many additional days receiving this evidence when in this case the commission has regarded such evidence as valueless or entitled to "little reliance." *New Eng. Tel. & Tel. Co.* v. *State,* 95 N. H. 353, 360. It is unnecessary to detail the infirmities of reproduction cost evidence or to cite the criticisms that have been directed against it. Barnes, The Economics of Public Utility Regulation, 545, 585. It is sufficient to state that, in the absence of statute requiring otherwise, such evidence may be disregarded or rejected if the commission thinks it is not entitled to be given weight in the case before it. *Panhandle Eastern Pipe Line Co.* v. *Federal Power Commission,* 143 F. (2d) 488, aff. 324 U. S. 635, *supra; Federal Power Commission* v. *Hope Gas Company,* 320 U. S. 591; *Colorado Interstate Co.* v. *Commission, supra.*

Unlike the statutes in some states, R. L., c. 292, ss. 27, 28, as amended by Laws 1951, c. 203, s. 46, contain no mandatory requirement that consideration be given to reproduction cost. *City of Pittsburgh* v. *Pennsylvania Public Utilities Commission,* 171 Pa. Super. 187; *Marietta* v. *Public Utilities Commission,* 148 Ohio St. 173. In fixing temporary rates, R. L., c. 292, s. 27, as amended, provides that they shall yield not less than a reasonable return on the cost of the property of the utility used and useful in the public service less accrued depreciation. In the determination of permanent rates the same statutory standard is prescribed "so far as possible." R. L., c. 292, s. 28, as amended. The statute also contains the following: "Nothing herein contained shall preclude the commission from receiving and considering any evidence which may be pertinent or material to the determination of a just and reasonable rate base and a just and reasonable rate of return thereon." It is clear that the dominant standard of the statutes is that rates shall be just and reasonable. *New Eng. Tel. & Tel. Co.* v. *State,* 95 N. H. 353. This allows the commission to consider or reject evidence of reproduction cost. It contains no mandatory

requirement that reproduction cost evidence is necessarily an integral criterion of value in determining just and reasonable rates. "Where an administrative agency has authority to choose the criteria determinative of an issue of fact, it may reject evidence which has no materiality in view of the criteria adopted." *Petition of Central Vermont Public Service Corp.*, 116 Vt. 206, 210.

If the Public Utilities Commission determines a just and reasonable rate base and a just and reasonable rate of return, the company cannot complain because the method adopted does not consider reproduction cost evidence. There is no vested right to any particular method of valuation. *City of Fort Smith* v. *Southwestern Bell Tel. Co.*, (Ark.) 247 S. W. (2d) 474, 482. Accordingly, we conclude that the commission committed no error in excluding reproduction cost evidence in this case. *Utah Power & Light Co.* v. *Public Service Commission*, 107 Utah 155.

2. RATE OF RETURN. The rate of return allowed was 5.65% which the company argues is confiscatory. In arriving at this rate of return the commission approached the question of a reasonable rate of return through the cost of money. The company has outstanding bonds, preferred stock and common stock. The annual cost of the outstanding bonds was determined by relating the annual net charges on the outstanding bonds to their net proceeds, making proper allowance for the call premium on the bonds called for redemption each year under the sinking fund provisions of the mortgage securing the bonds. This cost rate was computed as of December 31, 1951, at 3.10% per annum for the outstanding bonds and by a similar computation 3.43% per annum for the outstanding preferred stock.

The computation of the commission using two different capital structures of the company appears in the following tables (the first table represents capitalization as of December 31, 1951, and the second as of December 31, 1952):

| "Class of Security | Percent of Total | Rate | Cost of Money |
|---|---|---|---|
| Bonds | 54.7 | 3.10 | 1.70 |
| Preferred Stock | 13.3 | 3.43 | .46 |
| Equity | 32.0 | 9.48 | 3.03 |
| | 100.0 | | 5.19 |
| Bonds | 47.9 | 3.10 | 1.48 |
| Present Preferred Stock | 11.7 | 3.43 | .40 |
| Proposed Preferred Stock | 5.8 | 5.00 | .29 |

| Equity | 34.6 | 9.48 | 3.28 |
|---|---|---|---|
| | 100.0 | | 5.45" |

The cost of common stock or equity money is, of course, an important element in the total cost of money as such money is the most expensive for a utility to obtain. It constitutes a vital element of any rate of return that is to be reasonable. *Re: Public Service Co. of N. H.*, 33 N. H. P. S. C. 134 (1951). Evidence of the cost of equity money before the commission ranged from 9.14% to 10.5%. The decision of the commission of May, 1952, used 9.48% as the cost of equity money, both for the capital structure of the company as of December 31, 1951, and the proposed capital structure of the company as of December 31, 1952. The figure was developed by the witness Kosh in connection with State's exhibit 5 which was headed, "Embedded costs included in cost of Equity." The resulting total cost of money was found by the commission to be 5.19 as of December 31, 1951 and 5.45 as of December 31, 1952.

If a utility is to function effectively, this normally requires that the rate of return should be greater than the cost of money. This was recognized by the commission when it determined a just and reasonable rate of return as 5.65%: "The spread between the rate of return and the cost of money allowed above should be sufficient to absorb embedded costs, to maintain confidence in the financial soundness of the company, under efficient and economic management, and to enable the company to attract the capital necessary to discharge its obligations to its investors and consumers. This rate of return is over and above operating expenses, depreciation and taxes." While it is true that an attractive return to the investor is not necessarily just to the consumer (*Federal Power Commission* v. *Pipeline Co.*, 315 U. S. 575), a balancing of the interests of both investor and consumer requires a return which will enable the utility to maintain its credit and attract the necessary capital to meet increased demands for improvement and extension of its service. *Colorado Interstate Co.* v. *Federal Power Commission*, 324 U. S. 581.

Conceding these principles to be applicable it is urged by the manufacturers that on the evidence the rate of return should not exceed 5.39%, by special counsel for the state that it should not exceed 5.65% and by the company that it should be at least 6%.

Carefully documented arguments by each counsel present reasons why each rate should have been allowed rather than the rate prescribed by the commission. While the rate of return allowed in this case was not the only sustainable rate that could be allowed, and while there may have been some infirmities in the method of arriving at the rate (which are hereafter considered), the rate of return of 5.65% was not confiscatory and we cannot say that it was unreasonable or unjust. Since the rate of return can be justified in this case as a final result, any defects in the method of arriving at it need not vitiate it.

Although the matter has not been strongly urged here, it is at least arguable that the costs of refunding bonds and preferred stock formerly outstanding with presently outstanding bonds and preferred stock providing lower cost capital, should not be included as an item in the current cost of money. These costs associated with retired bonds and retired issues of preferred stock have been referred to as "embedded costs." Regarding such costs as sales discounts and call premiums as substantially a form of interest they should be discharged during the life of the issue. When an issue of bonds or stock is retired, the expenses including discount and premiums may be charged to surplus on the premise that the earnings during the period the issue was outstanding were overstated. In this way prior costs are not charged to future operations. However the commission followed the testimony that advocated that embedded costs should be recognized which on the record was a permissible if not a required method of determining the cost of money. *New Eng. Tel & Tel. Co.* v. *State*, 95 N. H. 353, 361.

The commission allowed a rate of return in excess of the cost of money "with the expectation that the company will not use any excess earnings accruing therefrom to increase the dividend rate upon the common stock" at the expense of obtaining an "ideal capital structure." This reason is somewhat novel since such a rate of return is usually allowed for the purpose of insuring the utility's ability to attract capital on favorable terms. The authority of the commission to directly restrict the company's dividend policy is not only doubtful but the restriction of earnings to surplus betterment purposes rather than the payment of acceptable dividends to improve the market for the company's stock may, to some extent, impair its ability to attract capital. However the supplemental decision of the commission in June, 1952, indicates substantial agreement with the thoughts here expressed.

With respect to the rate of return it took cognizance of the interests of both consumer and investor for the immediate future as well as the present. *New Eng. Tel. & Tel. Co.* v. *Kennelly*, (R. I.) 80 A. (2d) 891, 894. To the extent that the reason advanced in the original decision was erroneous, it appears to have been sufficiently explained thereafter in the supplemental decision on rehearing. The rate of return of 5.65% equates to a return at 10.90% on the actual equity and would produce a market premium, and so "whether generous or ungenerous, is at all events not confiscatory." *Dayton Power & Light Co.* v. *Public Utilities Commission of Ohio*, 292 U. S. 290, 311. Considering rates of return for comparable utilities as disclosed by the evidence, the argument that this rate is excessive cannot be adopted. *Cf. Chesapeake & Potomac Tel. Co.* v. *Public Service Commission*, (Md.) 93 A. (2d) 249. How much more than the cost of money "shall be allowed" for a rate of return "depends upon the Commission's determination of what is a 'just and reasonable' return." *New Eng. Tel. & Tel. Co.* v. *State*, 95 N. H. 353, 361.

3. DEDUCTION OF JACONA RESERVE FROM THE RATE BASE. While the amount involved ($389,564) is a relatively small portion of the rate base, its exclusion from the rate base requires consideration. The Jacona was a floating fuel burning electric generating plant of 20,000 KW nameplate capacity used and useful in the public service until 1945 when it was seized by the United States government for use in World War II. The company's investment in the Jacona less depreciation was $1,206,430 but the United States paid $1,625,000 for the seizure in 1946 which resulted in a book profit of $418,570. Deducting the expenses incurred in the settlement of the seizure claim the amount was $389,564. The commission reaffirmed its previous finding that it should not be included in the gross electric plant in service. *Re: Public Service Co. of N. H.*, 33 N. H. P. S. C. 134 (1951). Pursuant to section 112(f) of the Internal Revenue Code the amount received from the United States ($1,625,000) was earmarked and used in the purchase of a substitute floating power plant called the Resistance at a purchase price of $2,575,000 which was placed in service in December, 1947.

As we read the record depreciation on the Jacona while in the service of the company was charged at normal rates and not on an accelerated basis both on the books of the company and the reports to the commission. Under the system of accounts prescribed by the commission as well as matter of general equity the net profit

belonged to the stockholders. If the Jacona had been sold at a loss, the deficit could not be charged to future consumers. By the same token a profit cannot be awarded to future consumers. The force of inflation and the war emergency brought about the profit but this does not provide a basis for reaccounting for depreciation which necessarily results from deduction of the Jacona reserve. Furthermore the deduction would deprive the utility of a return upon its full investment in its property used and useful in the public service. It was error to deduct the Jacona reserve from the rate base.

4. WORKING CAPITAL ALLOWANCE. There was no substantial difference among the parties with respect to the allowance for working capital except as it related to average federal income tax accruals. Since this may be a substantial item in the rate base and it has been a factor in recent rate proceedings, brief comment on this subject appears advisable in this case. If it is true that the ratepayers are in fact providing current funds to the company through prepayments for income taxes which may be held and paid out at a much later date by the company, a deduction of average income tax accruals from the working capital allowance may be proper. Where the ratepayers provide such funds, it is not proper that the stockholder should be allowed a return on them by including them in the rate base. Recent amendments to the tax laws have not made this item a negligible matter in present day rate proceedings. *Pittsburgh* v. *Pennsylvania Public Utilities Commission* 370 Pa. 305; see 6 P. U. R. Digest, Valuation, *s.* 299.1; *Citizens Tel. Co.* v. *Public Service Commission,* (Ky.) 247 S. W. (2d) 510.

In suggesting that substantial accumulations of income tax accruals may be a proper item of adjustment in determining the computation of the working capital, we do not lay down any rule of law that such an adjustment must be made either in this case or in any other rate proceeding. Whether and to what extent funds contributed by the consumers should be deducted from the cash working capital required by the investors is essentially a question of fact within the province of the commission to decide under the circumstances of the case before it. Since effective arguments can be made both for and against the deduction of income tax accruals from the cash working capital of the utility, it is undesirable to freeze this determination of fact into a legal proposition which must be applied in every rate controversy. Note 52 Col. L. Rev.

673; 49 P. U. Fort. 855 (1952); *Chesapeake & Potomac Tel. Co.* v. *Commission* (Md.), 93 A. (2d) 249.

5. DETERMINATION OF DEFICIENCY OF TEMPORARY RATES. Revised Laws, chapter 292, section 6, as amended, empowers the commission to suspend a rate filing and *s.* 7, as amended, authorizes the establishment of temporary rates pending an investigation of the suspended rate filing. When permanent rates are established in excess of the temporary rates allowed the utility may recoup the difference "between the gross income obtained from the rates prescribed in such temporary order and the gross income which would have been obtained under the rates finally determined if applied during the period such temporary order was in effect." R. L., *c.* 292, *s.* 29, as amended by Laws 1951, *c.* 203, *s.* 46.

The commission found the 1951 net income to be $4,035,777 and because of better than normal water conditions deducted $151,208 resulting in an adjusted 1951 net income of $3,884,569. Having found that the company should earn a return of 5.65% on a December 31, 1951, rate base and that the adjusted income for the preceding year was deficient in the amount of $308,036 before income taxes ($641,742 after taxes) the commission then divided this deficiency in half to determine the amount of the deficiency for the six month period from about December 1, 1951, to June 1, 1952, when the temporary rate increase of approximately $703,000 was in effect. It is understood that the temporary rates were actually in effect from November 29, 1951, to June 9, 1952, but we have stated the computation as it was made by the commission. The commission allowed the company to recover one-half of the deficiency of $308,036 or $154,018 "through a medium of a 3% per month surcharge for seven months, or until this amount of $320,871 is recouped." This recoupment of $154,018, or $320,871, with taxes included, has been referred to as a temporary rate deficit. The company did not appeal the computation of recoupment but both the state and the manufacturers complain that the commission did not compute the recoupment in accordance with the statute (R. L., *c.* 292, *s.* 29, as amended) and thereby unduly penalized consumers by failing to give due consideration to the growth in the use of electricity, and to any benefits accruing to the company from abnormal water in this period.

The propriety of providing for some recoupment in this case is not doubtful but it is reasonably clear that it was not determined in accordance with the applicable statute. See *N. E. Tel. & Tel.*

*Co.* v. *State,* 95 N. H. 515. There was no evidence of the actual revenues of the six month period described as from December 1, 1951, to June 1, 1952, when the temporary rate increase of $703,000 was effective. "The only known figures in this case since December 31, 1951, are the rate base of that date and the actual results of the year 1951." The commission did not follow the statutory method of allowing recoupment of the difference between the gross income produced by the temporary rates and what would have been produced by permanent rates applied to the period of the temporary order. The commission allowed one-half of what it determined the annual deficiency to be, based on a year-end rate base and the adjusted net income for 1951. The correct amount of the recoupment cannot be determined from the record but, whether greater or less than actually allowed, it must be determined in accordance with R. L., c. 292, s. 29, as amended. See *New Eng. Tel. & Tel. Co.* v. *State,* 95 N. H. 353, 358.

The year 1951 was one of abnormally high water conditions. This was recognized by the commission by making an adjustment in the amount of $151,208, in computing the company's income deficiency. Such an adjustment for purposes of computing future earnings was proper. However, deduction of such an amount from the company's actual earnings for purposes of computing a surcharge for a hypothetical deficiency of income during a past period was improper. The purpose of normalizing water conditions should be to project a representative test year for prospective rate making but in this case the adjustment was made retroactively as a basis for reducing the company's income deficiency.

6. THE RATE BASE. The commission determined a spot rate base as of December 31, 1951, in the amount of $73,926,448 which was rounded to $74,000,000. It is urged by counsel for the manufacturers and the State that this is error since the rate base should relate to the period for which the earnings are being tested. The commission related the results of operations for 1951 to the year-end rate base and it is urged that the 1951 earnings should be related only to a 1951 average rate base in determining the amount of rate relief. It is obvious that relating 1951 earnings to a year-end rate base at December 31, 1951, results in the allowance of higher rates than would result from the use of the 1951 average rate base. The exhibits presented by the company, which with some deductions were used by the commission in determining the rate base figures, shows that in round figures the average rate

base for 1951 was $71,984,000 compared with the rate base at December 31, 1951, of $74,000,000.

The company supports the findings and method of the commission's decision by referring to decisions of other regulatory commissions which are said to have used a similar method. *Re Mountain States Telephone & Telegraph Co.*, 94 P. U. R. (N.S.) 33 (Col., 1952); *Re Interstate Telephone Co.*, 91 P. U. R. (N.S.) 27 (Idaho, 1951); *Re Mountain States Tel. & Tel. Co.*, 91 P. U. R. (N.S.) 497 (Idaho 1951); *Re Southwestern Bell Telephone Co.*, 87 P. U. R. (N.S.) 97 (Ark., 1951). Both the State and the manufacturers claim this method is erroneous and results in unwarranted revenue to the company. *Re Wisconsin Electric Power Co.*, 93 P. U. R. (N.S.) 97 (Wis., 1952). This raises the issue as to whether the method employed by the commission can be justified legally and factually in the proceedings before us for review.

The commission was free to choose a rate base as of December, 1951, or an average rate base for the year 1951. In determining the deficiency of revenue it is customary to correlate a year-end rate base with year-end income or to correlate an average rate base with average income for that year. "While the commission is free to use average investment figures, they are to be distinguished from year-end figures." *New Eng. Tel. & Tel. Co. v. State*, 95 N. H. 353, 360. If a year-end rate base is not related to a year-end income in an expanding plant, recognition is not given to growth, increased productivity and earnings for the full year. In this case there was an increase of net electric plant in service, exclusive of working capital, of approximately $2,700,000 from the first of the year 1951, to the last of that year and 60% of that amount was added in December of that year. While the increase of revenue may not be in exact ratio to the increase in the rate base, the exhibits and evidence did show that revenue was increasing. The record indicates that this utility is a growing and expanding one, that its increase in plant will produce greater capacity and productivity, and more customers and revenue. In such a case average earnings throughout the year 1951 will be less than at the year end. The determination of additional revenue to produce a reasonable return in such an expanding utility cannot fairly be calculated by using a year-end rate base and the average earnings from the preceding year. In a case like this the rate base should relate to the period for which earnings are being tested in order to reach a just result which was not done in this rate proceeding.

The difference between the year-end rate base of $74,000,000 and the average rate base of $71,984,000 at a 5.65% rate of return is $113,904 after federal income tax and $237,000 before said tax. The argument is advanced that it is a reasonable inference that $237,000 is the amount allowed by the commission for attrition. Attrition is a factor for which allowance may be made but there are reasons why we do not feel free to attempt to spell out possible justification for this inference in this case. In the first place it involves considerable conjecture in view of the absence of express findings by the commission. Secondly it is equally plausible that attrition was considered and allowed in the rate of return, along with embedded costs, the necessity to maintain the company's credit and to attract capital. Finally the allowance of this amount might result in a double recognition of attrition in both the rate base and the rate of return, producing a larger return than was intended. Barnes, The Economics of Public Utility Regulation, 528.

7. ACCELERATED AMORTIZATION. Under the federal Defense Production Act the company has received certificates for accelerated amortization on $4,500,000 of investment in property. The bulk of these certificates were received in 1952 and would not be used by the company for reducing income taxes until 1953. The company has not voted to accept and exercise these certificates which allows depreciation of the investment for federal income tax purposes over a five year period rather than over the life of property. See section 124(a) of the Internal Revenue Code. The record contains opinion evidence that income tax savings from these certificates did not represent true net income but should be placed in a special account against the future increased tax liability. The commission regarded this as an accounting problem and retained jurisdiction of the matter. The commission stated that it would "issue such orders as it considers necessary when, as and if the company later decides to accept certificates of necessity from Defense Production Administration under 124(a) of the Internal Revenue Code."

The disposition of this matter by the commission was both sensible and proper. The brief on behalf of the company states the conclusion succinctly: "Certainly the question of whether the savings constitute net earnings available for dividends within the meaning of the commission's system accounts is an accounting problem subject to the jurisdiction of the commission." R. L., c. 289, ss. 7, 11, as amended.

8. THE RATE GV FOR PRIMARY GENERAL SERVICE APPLICABLE TO

MANUFACTURERS AS CLASS III CUSTOMERS. Our statutes provide, in general terms only, for a reasonable rate structure by prohibiting undue preferences to any service or customer but allows differentials to classes of customers or customers in the same class where "absolute uniformity" is not required under the circumstances. R. L., c. 292, ss. 11, 12, as amended. The complex and difficult task of distributing a rate increase among the ratepayers so as to eliminate discriminations and unfairness has been entrusted to the commission. *Federal Power Commission* v. *Pipeline Co.*, 315 U. S. 575, 584; *New Eng. Tel. & Tel. Co.* v. *State*, 95 N. H. 353, 364. A major complaint of the manufacturers is that the GV or class III rate is excessively high, competitively as well as comparatively, for customers having high load factors (long hours use) in relation to the level of the rate for customers having low load factors (short hours use). The commission did not decrease class III rates and in May, 1952, ordered the rate increase "to be distributed equitably among all classes of service." The tariff filed by the company in pursuance of its understanding of this order raised class III a less percentage than other classes except street lighting. The commission, after conference with the parties, rejected the tariff and requested one that would increase each class by approximately the same percentage. This was done and the filing became effective in June, 1952. The manufacturers appealed the final GV rate (which was higher than the rate originally filed by the company in October, 1951), on the further ground that the commission had previously ruled it would not grant rates higher than those filed by the company in October, 1951.

Both the manufacturers and the company introduced detailed and elaborate cost analysis studies by competent experts as to the rate structure of the utility and these experts were subject to extensive cross-examination by the parties to this proceeding. The cost determination of how the needed total revenue shall be contributed by classes of consumers, for whose use, need and benefit the facilities of the works are provided, may be supported by many different theories. In at least one respect the opposing experts in this case both used noncoincident demand allocation to determine the cost of service between customers. As naturally would be expected the component parts and percentages used by the experts in computing the cost to each class disclosed variations. Thus in allocating hydro investment and expense the company allocated 54% of these accounts to demand, 46% to energy on an adverse water allocation.

The manufacturers' expert allocated 73% to demand, 27% to energy on an average water allocation. This was one of the more controversial items in dispute.

The difference in the method employed by the experts is further exemplified in the allocation of boiler accounts. The company's witness allocated 22.17% to energy while the manufacturers' witness allocated all of it to demand. There are regulatory decisions and authority to support each view. While it is true that the mathematical formula used by the company's witness to determine the per cent to be allocated to energy would produce some absurd results in situations not encountered here, the witness was firm in his opinion that the formula produced a reasonable and justifiable result for this utility on its past history and for the expectable future. Similar variations appeared as to allocation of investment and expense to secondary sales. The company's witness credited all revenues derived therefrom to the expense of generation benefiting all customers, whereas the manufacturers' witness claimed that the investment and expense should be assigned to secondary sales with a resulting higher rate of return for class III customers. It was further pointed out that investment and expense were assigned to secondary sales in a previous report made by the firm of the company's witness and should have been used in this case. The manufacturers' witness used an 85% proximity factor applied to class III in the allocation of transmission line accounts and substations. The company's witness maintained that it was fallacious to base rates upon the distance the customer is from the generating plant and took the position that in an integrated system class III consumers should pay for the benefit received thereby. In all these areas of dispute as well as some other subsidiary ones, the commission had to make an informed factual judgment on its own valuation of the witness' testimony and exhibits. It is not the function of this court to say that more weight should be given to the manufacturers' witness in certain instances than was done by the commission. The determination of these questions rests with the commission and we cannot say that error was committed by the commission when it followed substantially the company's expert when it found that "class III customers now have a considerable differential in present rates in comparison to rates of other classes."

We have reviewed the extensive arguments submitted on rate structure but have not attempted to detail them at length in this opinion. While the commission did not specifically state that it

accepted one witness over the other, its findings leave no room for doubt that it did not accept the theories advocated by the manufacturers. Having in mind that our statutes do not require an absolute and rigid uniformity and that there is evidence in the record to support the existing rate structure, we affirm the commission's ruling as it relates to class III consumers.

The final GV rate is higher than the filed GV rate of October, 1951. This raises the question whether the final GV rate is unlawful because the commission had previously stated that it would allow no rates higher than those originally filed in October, 1951. Since it is the duty of the commission to establish reasonable and just rates, there is no statutory limitation which confines them to filed rates and to that extent the statement of the commission was erroneous. However, it does have the power to reverse such a ruling in part or whole and this was what was done in the final allowance of the GV rate. It has been argued that this ignores the cost studies prepared by the company's witness and was therefore without any basis in the evidence. Since the commission was of the opinion that other class rates should not be further increased for the benefit of class III rates, we cannot say as a matter of law that the final GV rate unduly penalized the class III customers. The commission was not required to accept the cost analysis submitted by the company in its every detail. The difference between the final GV rate and the one which would be supported by the cost study of the company was not so great as to violate the provisions of R. L., c. 292, s. 11, as amended.

9. CONCLUSION. The treatment and determinations made by the commission relative to reproduction cost evidence, rate of return, working capital allowance, accelerated amortization and class III rates are affirmed. We agree with the company's contention relative to the Jacona Reserve and the contentions of the State and the manufacturers with regard to the rate base and the determination of the temporary rate deficiency. In remanding this to the commission for necessary revision and orders consistent with this opinion, it is believed that adjustments can be made without the complicated, expensive and time consuming procedure of an entirely new and full-fledged rate hearing. For the reasons hereinbefore indicated, the order is

*Remanded.*

GOODNOW, J., was absent: the others concurred.