Public Utilities Commission,
No. 4731.

PUBLIC SERVICE COMPANY & a. v. STATE & a.

Argued May 7, 1959.

Decided June 30, 1959.

152

*Louis C. Wyman,* Attorney General, *Warren E. Waters,* Deputy Attorney General, and *John N. Nassikas,* special counsel (*Mr. Nassikas* orally), for the State.

*Sulloway, Hollis, Godfrey & Soden* (*Mr. Hollis* orally), for Public Service Company of New Hampshire, and New Hampshire Electric Company.

*Atlee F. Zellers* (by brief and orally), for New Hampshire Electric Cooperative, Inc. and White Mountain Power Company.

DUNCAN, J. The chief issue relating to the determination of rate base arises out of the circumstance that Public Service Company holds certain "emergency certificates" issued under the

National Defense Production Act of 1950. U.S.C. A., 50 App. *s*. 2153; Exec. Order No. 10193. These certificates entitle it under section 168 of the Internal Revenue Code of 1954 to an income tax deduction for accelerated amortization with respect to the facilities to which the certificates relate, in lieu of depreciation under section 167. 26 U. S. C. A., *s*. 168 (a). The company is thus permitted to write off the entire cost of the facility or any part thereof in a period of five years, after which no reduction in income taxes with respect to the cost so written off is permitted. 4 Mertens, Law of Federal Income Taxation, *s*. 23.135. In comparison with what the tax would be if only the usual depreciation over the useful life of the facility were taken, this results in a substantial reduction of income tax liability for the five years in question, and in a higher tax over the balance of the life of the property.

Under accounting procedures established by the Commission, the company has established a "restricted surplus account" reflecting the difference between the actual income tax paid after deductions for accelerated amortization, and the amount which the tax would have been if computed with deductions for normal depreciation only. This "restricted surplus," as indicated by the report of the Commission in this case, is held by the utility "against the future income tax liability . . . in order to protect the future rate-payers."

For rate-making purposes however, the company's expense for income taxes for the test year was "normalized" by an upward adjustment of $685,386, the effect being to permit recovery of income tax liability through rates at a constant level, based upon normal depreciation of the company's property throughout its useful life rather than at a lower level for the five-year period of accelerated amortization, followed by a higher level for the remaining life of the property.

In establishing a rate base, the Commission deducted from the working capital requirement as computed by the companies the sum of $2,702,000 on account of "Deferred Income Tax Availability." This amount the Commission found to be the average amount of the "restricted surplus" available during the test year.

With respect to the average available surplus the Commission found: "Through the normalization of these deferred Federal Income Taxes . . . the ratepayer definitely provides these funds, and the companies have the use of them until the deferred taxes are paid. Therefore, the investor should not be allowed a return on

funds he did not provide. When the deferred Federal Income Taxes are paid, and the investor has to replenish these monies, at that time he is entitled to a return on the funds so invested. If the Companies elect to invest deferred Federal Income Tax funds in assets other than plant or Working Capital, this amount should still be deducted from the rate base, as the ratepayers have provided these funds."

The action of the Commission in deducting from working capital the average availability in the test year of the deferred income tax surplus is attacked by the companies upon grounds that it violates the intent of Congress in enacting section 168 of the Internal Revenue Code, that it violates the provisions of RSA 378:27, 28, and that it operates to deprive the company of $330,770 in additional revenue and hence of a fair return upon its property, in violation of the New Hampshire Constitution. The State on the other hand, supports the principle of deducting the average availability of the deferred federal income tax surplus, but contends that the Commission erred in not deducting the average availability for the year 1959, when the rates would become effective, and which would amount to $3,706,000, rather than the amount for the test year ended May 31, 1958, which it did deduct.

The principal question is whether the availability of the funds which accrue to the "restricted surplus account" as a result of the provisions of section 168 should inure to the benefit of the investor or of the consumer. The company points out that the funds are available only because the investor has already furnished the plant which gives rise to the right to emergency certificates. This circumstance does not appear to us to be decisive. The plant in question, with normal depreciation taken, constitutes a part of the rate base upon which the consumer is required to pay an annual return. Thus provision is made for compensation of the investor for the use of the property which he has provided. To the extent that tax benefits result to the company from accelerated amortization, the investor is relieved from the need for providing working capital for the company, or the company is relieved of the burden of obtaining additional financing to provide such working capital. Current ratepayers, however, receive no benefit from accelerated amortization, since they pay rates calculated on a basis of a normalized tax, as if the company were taxed upon its income reduced by unaccelerated depreciation only. We cannot say that the Commission's conclusion that as between the investor and the

consumer the equities in the surplus in question lie with the consumer and that its average availability should be deducted from working capital was "clearly unreasonable or unlawful." RSA 541:13.

Adoption of the view advanced by the companies would require the consumer to pay a return upon funds available for working capital as a result of the provisions of section 168. These funds are available at no cost to the investor, from rates paid by the consumer. They are in no proper sense a loan from the government, nor do they represent taxes owed to the government. They are an asset of the company in part currently and temporarily available for its use, which ultimately may or may not be required to satisfy future income taxes. How long the company will be able to defer tax liability will necessarily be affected by the interrelation of a number of factors which are subject to change, such as the present provisions of the tax and defense statutes, the rate of addition of new facilities by the company, and the possible disposition of portions of its property during its depreciable life.

The companies suggest that the "restricted surplus account" is analogous to the "Jacona Reserve" held in *Chicopee Mfg. Co. v. Company*, 98 N. H. 5, 13, 14, to have been erroneously deducted from rate base. The "Jacona Reserve," however, was a book profit which had been realized upon an involuntary transfer of a capital asset, and reinvested in a similar asset upon which the investors were clearly entitled to a return. It has no true similarity to the surplus account established out of income furnished by the ratepayers as a result of "normalized" taxes, which is held against future tax expense but is presently available as working capital.

Despite the holding of *Detroit v. Federal Power Commission*, 230 F. (2d) 810, 822 (D. C. Cir. 1955), relied upon by the companies, the fact is that Congress has not undertaken to provide what effect, if any, section 168 shall have upon rate making. The congressional purpose was accomplished when the company was encouraged to undertake the construction of facilities deemed "necessary in the interest of national defense." See *United States v. Allen-Bradley Co.*, 352 U. S. 306, 307; 4 Mertens, Law of Federal Income Taxation, *supra*, s. 23.128.

The question which the Commission has determined has received lengthy and detailed consideration by other regulatory bodies and by the courts, in some instances with special reference to the treatment of liberalized depreciation under section 167 of the

Internal Revenue Code. Possible alternative methods of treatment for purposes of regulation have been closely scrutinized with divergent conclusions. See *C. M. P. Co.* v. *P. U. C.*, 153 Me. 228, 246-249; Proceedings, Seventieth Annual Convention (1958) National Association of Railroad and Utilities Commissioners 413-445; *Re Niagara Mohawk Corp.*, 28 P. U. R. (3d) 171; *Re Georgia Power Co.*, 10 P. U. R. (3d) 259.

As has been pointed out in a recent note: "From a practical standpoint, deducting the reserve from the rate base would partially offset the upward pressure exerted on rates in early years by inclusion of the normalization factor in tax expense, and would thereby achieve a compromise between investor and consumer interests which would make the normalization procedure more acceptable to the latter. However, the accelerated reserve must be considerable before the downward pressure exerted on rates by deducting it will substantially offset the upward pressure exerted by the tax normalization. Since the allowed rate of return for utilities is usually five to eight per cent, a deduction of $100,000 from the rate base will effect only a $5,000 to $8,000 reduction in rates." "Utility Rate Making and Section 167," 69 Harv. L. Rev. 1096, 1104.

The conclusion reached by the Commission that the average available amount of the surplus for deferred income taxes should be deducted from working capital was neither unjust nor unreasonable as a matter of equity. The companies contend that it was erroneous as a matter of law. RSA 378:27, 28. Section 28, *supra,* directs the Commission so far as possible to apply the provisions of section 27 in fixing permanent rates. Section 27 provides that temporary rates "shall be sufficient to yield not less than a reasonable return on the cost of the property of the utility used and useful in the public service less accrued depreciation . . . . " The companies assert that the restricted surplus account is "property of the utility" upon which it is entitled under the statute to a reasonable return. This argument appears to us to disregard the fact that the statute provides for a return upon "the cost" of the property and that the surplus account was acquired by the company without cost. We find no error, and no violation of the Constitution, in the deduction of the surplus account from working capital. *Chicopee Mfg. Co.* v. *Company,* 98 N. H. 5, 14; *New Eng. Tel. & Tel. Co.* v. *State,* 98 N. H. 211, 222.

As previously indicated, the State argues that the Commission

erred in failing to deduct the 1959 surplus average availability of $3,706,000 rather than the test year availability of $2,702,000 actually used. On an analogous point the State has also argued that in computing the amount of cash available from regular income taxes, the Commission should have used the 1959 schedule of payments.

In this connection the Commission's report states: "The test year's average availability . . . should be used . . . due to the fact that this is the actual average amount available for the test year ended May 31, 1958. To be consistent with the test period concept . . . the Deferred Income Tax Availability must be correlated to the same test period. As stated in the *Chicopee* case, 'The rate base should relate to the period for which earnings are being tested in order to reach a just result.' "

The company has pointed out that the deferred income tax surplus availability figure for 1959 is an average figure, not fully in hand until December 31, 1959 (*Cf. Trunkline Gas Co.* v. *Federal Power Commission*, 247 F. (2d) 159, 165. *et seq* (1st Cir. 1957) ); and that the actual tax payment schedule for 1959 reflects payment of portions of the income taxes for two years, in proportions which will be different in the following year under statutory requirements gradually effecting a "pay-as-you-go plan."

While it must be recognized that test-year figures are frequently pro-formed to reflect immediate and known future income or expenses not present throughout the year, and were in certain respects so pro-formed in this case, the extent to which the test-year rate base should be adjusted because of changes expected at a later time is open to serious question. *Chicopee Mfg. Co.* v. *Company, supra*, 5, 16, 17. The test-year income and expense is necessarily to be related to the test-year rate base. The need for "additional revenue . . . cannot fairly be calculated by using" a working-capital requirement for one year and the "average" tax fund availability figures for a later year. *Cf. Id.*, 17. To the extent that 1959 expenses or income are carried into the figures of the test year, the farther away from a true "test" the test-year figures are likely to be.

Without reviewing the intricacies of the considerations entering into the conclusion reached by the Commission, it is sufficient to say that we have considered the arguments filed by the parties and conclude that the action of the Commission was not beyond the bounds of reason, or erroneous as a matter of law. We do not

interpret the Commission's reference to the *Chicopee* case, quoted above, as an indication that it considered that the course followed was necessarily required as a matter of law. Rather it was a statement of test-year principles to which no exception was considered warranted with respect to working capital. The contentions advanced by the parties with respect to the determination of working-capital requirements are rejected.

This investigation was conducted during a period which was frequently described as one of "economic recession." Both the State and the companies were prepared to agree that there need be no issue with respect to a reasonable rate of return. The State offered to agree unconditionally that a return of 5.65% would be reasonable for permanent rates. Before filing their tariffs, the companies concluded to request no change in rate of return, but rather to seek a specific dollar increase in rates, without conceding that a 5.65% rate of return would necessarily be reasonable, or even adequate. Accordingly they indicated a willingness that a 5.65% rate of return should be used in determining the rates, provided that in other respects the same rate-making procedures should be used as had been followed in prior proceedings relative to rates of Public Service Company in which the 5.65% rate had been established and utilized. See *Chicopee Mfg. Co.* v. *Company*, 98 N. H. 5, *supra*; *Public Service Company of New Hampshire*, 36 N. H. P. U. C. R. 17; *Id.*, 39 N. H. P. U. C. R. 112.

The Commission, having been advised early in the proceedings of the respective positions of the parties, was called upon to establish temporary rates, and did so on September 30, 1958, upon a finding that during the pendency of the proceedings the companies probably would not receive a return at the previously established rate of 5.65%. *Public Service Co.* v. *State*, 102 N. H. 66.

Following the close of the evidence in the temporary rate proceedings on August 28, 1958, and after resumption of the hearings with respect to permanent rates, the Commission, in ruling upon a motion by the companies, indicated that any evidence relating to "fair rate of return" should be presented "as soon as possible"; and ruled that if none were presented, "the commission will use the 5.65% rate of return as determined in the prior proceedings, see D-R 3152." See *Chicopee Mfg. Co.* v. *Company*, 98 N. H. 5, 6.

Thereafter no expert testimony upon the subject was offered by the companies. On October 23, 1958, a witness was examined by counsel for the companies with reference to Exhibits P-10 and P-28,

concerning a comparison between the returns received by the industry as a whole and the return which would be received by the companies if the surplus account for deferred income taxes should be deducted from working capital as proposed by the State. Upon objection counsel stated that the evidence was "not offered for the purpose of changing the 5.65 per cent rate of return," but to show "what the situation is going to be on a comparative basis when the . . . Company enters the money market . . . in terms of its competitive disadvantage with the industry as a whole." Counsel then further stated that "the Company has not asked and will not ask to have the rate of return of 5.65 increased at this time." As late as December 30, 1958, the companies reiterated that they "understood from the outset that rate of return would not be an issue if the cases were based on a 5.65% rate of return which was done."

In its decision and order dated February 4, 1959, fixing the permanent rates, after referring to the fact that no evidence relative to a different rate of return had been introduced, the Commission found and ruled: "From an examination of the reports of these Companies, filed with the Commission, it appears that [a] rate of return [of 5.65%] is reasonable. It is accepted as the rate of return in this proceeding."

The companies do not now challenge this portion of the decision. The State however takes the position that the record contains no evidence to warrant a finding that a return of 5.65% is reasonable. Its argument in support of its position appears to resolve itself into the proposition that while the evidence encompassed many of the various components of rate of return, including actual capital structure and the cost of recent security issues by Public Service Company, no expert testimony was presented by the companies as to the probable cost of money or of equity capital. *Cf. Chicopee Mfg. Co.* v. *Company,* 98 N. H. 5, 10-12.

In view of the positions taken by counsel for both sides from the outset of the proceedings, we do not consider that the Commission erred in adopting the 5.65% rate of return. With one party prepared to agree that the rate was reasonable, and the other consistently declining to question it, the Commission was not called upon to launch a time-consuming investigation into the cost of money merely because counsel persisted in jockeying for position throughout the hearings. The companies upon which the burden of proof rested declined to question the rate which the

State had indicated it would accept as reasonable. If the conditions imposed by the companies prevented agreement at the outset, their objections to the 5.65% rate were waived before the hearings concluded by their failure to offer evidence of "fair rate of return." The State, in view of its profession that it would agree that a rate of 5.65% was reasonable, should not now be heard to complain that it was found reasonable upon insufficient evidence. The Commission's decision indicates that it took into account the fact that a consolidated tariff was before it, and the reports of the companies which the statute requires to be considered (RSA 378:27, 28, *supra*) furnished much of the evidence needed to support the reasonableness of the rate of return suggested by the State.

The case of *Petition of N. E. Tel. & Tel. Co.*, 120 Vt. 181, cited by the State, is not here controlling. In that case no reasonable rate of return was agreed upon by the parties and none was found by the Commission. In the proceedings now under review, the State indicated that it considered the 5.65% rate to be reasonable, the companies sought no different rate, and the Commission found the rate to be reasonable. In this we see no error.

The State urges that it was error for the Commission to include in the working-capital component of rate base the sum of $475,000, as working capital for sales and new business, and to include in operating expenses a loss of $62,566 allocated to the operation of Public Service Company's appliance department, and charitable contributions of $30,760 for the test year.

The Commission report put the companies upon notice that future deficits in the appliance or service departments would be treated as a charge against surplus, but anticipating that new accounting procedures would place the appliance department on at least a break-even basis, made "no reduction in Rate Base" because of the loss in that department. The Commission approved use, as an expense, of the figure quoted above for charitable contributions. "Such contributions" the Commission found, "are vital to establish and improve public relations," are in a category with advertising, and in the amount stated constituted reasonable expense.

The action of the Commission in regard to these matters does not appear to us unreasonable or unlawful. While the generation and sale of electrical energy is a monopolistic undertaking, it cannot be said to be free from competition. Appliance sales and service are closely related to promotion of sales and consumption of electricity. Consumers benefit from increased demand in the

form of decreased unit cost of service. *Public Service Co. of Mo.* v. *Mo. So. Pub. Serv. Co.*, 6 P. U. R. (N. S.) 269, 289. This is a field in which management must be allowed some discretion, within the bounds of good faith and prudent judgment. "Within the limits of reason, advertising or development expenses to foster normal growth are legitimate charges upon income for rate purposes . . . " *West Ohio Gas Company* v. *Public Utilities Comm.* (No. 1), 294 U. S. 63, 72. See also, *Pa. P. U. C.* v. *Pa. Power & Light Co.*, 14 P. U. R. (3d) 438, 475. Charitable contributions are not universally regarded as a deductible expense for rate-making purposes. However in modest amounts and for public purposes they may properly be allowed as a business expense. *N. J. Bell Tel. Co.* v. *Bd. of P. U. Com'rs*, 12 N. J. 568, 596-7; *Board of Supervisors* v. *Vepco*, 196 Va. 1102, 1118. We see in this record no occasion to question the judgment of the Commission in its treatment of sales and new business, and charitable contributions.

The State has consistently taken the further position that because the test year fell within a period of economic recession, normalizing adjustments should have been made to test-year income figures to allow for a predicted resumption of anticipated "normal" growth in future revenues. In support of this position it offered expert testimony tending to show that statistical studies of past operations of Public Service Company indicated an average normal growth of 6.6% annually, in kilowatt hours sold; that such growth would increase revenue at the rate of 2.2% over the preceding year; and that 22% of the additional revenue so produced would be "carried down" to net operating revenues. Using 1957 as a base year the witness applied this theory to arrive at the conclusion that in the year 1958 with normalized sales, revenue, and net operating income, the companies would show a return of 5.6% for that year.

The parties disagree as to the consequences of applying similar adjustments to the figures for the test year ending May 31, 1958, which the witness was not asked to do. The companies point significantly to his testimony that he did not intend that his figures for the year 1958 as thus normalized should lead the Commission to conclude that a rate increase was unwarranted.

The Commission declined to adjust the test-year figures upon the assumption that the recession had ended, and that earnings resulting from "normal" growth in the future would produce increased income to offset the probable deficiency demonstrated by test-year

figures without such adjustment. In this regard it stated in its report: "Thus, a test period formula is proper because it is based on facts. It is improper to normalize revenues and net operating income from unknown future conditions unless all operating expenses are also normalized." It referred to the speculation involved in predicting future business trends and emphasized the fallacy in predicting "normal" growth on a basis of past statistics reflecting interim rate increases. This we understand to refer to the fact that from 1951 through 1957 five rate increases were granted to the Public Service Company, each of which contributed in greater or lesser degree, to revenues for the intervening years and to each year's ratio of net operating income to revenues.

Hence the Commission concluded: "It is equally fallacious to compute the growth of operating revenue which includes all past rate increases, and predict normal growth therefrom. If all rate increases were eliminated from operating revenues, the 22% carry down to net operating income . . . could nearly disappear. Any other percentage would be as unreliable and valueless."

By brief and orally the parties have presented their views of the State's evidence, with particular detail. The company has stressed the failure of the State's expert to distinguish between secondary and primary kilowatt hours, only the latter of which it argues, can properly be said to exhibit any reliable pattern of growth. It has sought to demonstrate other errors which it considers to be inherent in the computations presented by the State.

The State urges that the Commission erred in its conclusions on the question of normalization of test-year figures for the effect of the recession, and seeks to demonstrate this by its own application of the witness' theory. The State's burden with respect to this as with other issues, is to demonstrate "by a clear preponderance of the evidence" that the Commission's order is unjust and unreasonable (RSA 541:13), while the findings of the Commission are to be deemed *"prima facie* lawful and reasonable." *Id.* In matters of theory like the issue now considered, this is a difficult burden to sustain. We are not convinced that the Commission was wrong in its conclusions upon the issue.

Aside from other considerations, such as the effect of the State's use of figures reflecting the several rate increases in making its predictions, the fundamental principles underlying a test-year approach militate against adoption of the State's argument. The test year is designed to produce an index to the deficiencies in

earnings which the companies will probably encounter in the immediate future, as indicated by actual operations in the known and recent past. To the extent that test-year figures can be accurately pro-formed to reflect established and current changes in revenues or expenses, modification of test-year figures is considered appropriate. How far beyond this point modification should be permitted is a matter calling for the exercise of "enlightened judgment" (*Bluefield Company* v. *Public Service Comm.*, 262 U. S. 679, 692), where errors are not readily demonstrable by clear preponderance. "If the Commission adjusts the results of the test year to meet facts, i. e., the wage increase . . . it is on firm ground. To do more . . . would destroy or seriously weaken the effectiveness of the test year, a valued and respected tool in rate making." *C. M. P. Co.* v. *P. U. C.*, 153 Me. 228, 242-3. See *Pittsburgh* v. *Pa. Pub. Util. Comm'n*, 187 Pa. Super. 341, and cases cited. The adjustment which the State urged upon the Commission was not so clearly required that the decision must be set aside because the adjustment was not made. *Cf. West Ohio Gas Co.* v. *Commission* (*No. 2*), 294 U. S. 79, 82.

Although the companies sought an upward allowance on account of anticipated attrition in the rate of return, none was granted by the Commission. It was denied in the recognition that an end to the recession might nevertheless produce benefits which would offset it. The company concedes that it cannot meet the statutory standard in demonstrating that the Commission erred in denying an allowance for attrition. A reduction in the probable deficiency in return to the companies as shown by test-year figures was no more clearly compelled on the ground of probable "recovery" from the recession. The contentions of both State and companies relating to the denial of the respective adjustments sought by each are overruled.

As previously indicated, New Hampshire Electric Cooperative, Inc. and White Mountain Power Company have raised no issues with respect to the aggregate amount of the rate increase granted by the Commission. They purchase from Public Service Company virtually all of their power requirements, for resale to their own consumers. As consumers under the Class V rate, they have appealed from the order of the Commission upon the ground that the allocation of rates among the various classes of consumers is unjust and unreasonable as applied to Class V customers, and prejudicial and discriminatory against them. Specifically they

contend that the rate classification results in charges to Class V customers requiring payment of an unfair and unreasonable proportion of the total cost of rendering the service.

As finally approved by the Commission the increase in rates affects all classes of consumers except those of Class V. However, the return which will be paid under the new rate schedule by Class V customers, as determined upon the basis of cost studies conducted by Public Service Company, will be 107.74% of the over-all return furnished by all classes of customers. As compared with a rate of return upon costing base paid by all classes of 4.843%, Class V customers will furnish a return at a rate of 5.219%. In consequence the appellant companies contend that discrimination results, and that the Public Service Company failed to sustain its burden of establishing that the allocation of rates is reasonable.

RSA 378:10 prohibits any utility from subjecting any person or corporation to any "undue or unreasonable" prejudice or disadvantage, in any respect whatever. At the same time section 11 provides that "absolute uniformity" in charges shall not be required when lack of uniformity is reasonable, and that "differential rates" shall not be prohibited, subject to the approval of the Commission, if such rates shall be "reasonable and just."

We are therefore called upon to determine whether the clear preponderance of the evidence establishes that the order of the Commission approving the rates, as allocated, is "unjust or unreasonable" (RSA 541:13, *supra*) because the several classes of rates were erroneously found to be reasonable. *Chicopee Mfg. Co. v. Company*, 98 N. H. 5, *supra*, 19. The record discloses that prior to the current increase the returns upon costing base from the five classes of customers bore the following ratios to the over-all return from all classes: I (domestic), 94.77%; II (general), 121.66%; III (primary general), 89.22%; IV (street lighting), 83.68%; V (transmission general), 111.80%. As a result of approval of the new rates, these ratios now approach more closely to uniformity as follows: I, 96.18%; II, 118.36%; III, 90.34%; IV, 87.03%; V, 107.74%.

In support of the tariffs originally filed in these proceedings, Public Service Company's research engineer described in detail the several classes of rates, and the proposed increases within each class. He testified that "in designing the proposed set of rates a number of factors were taken into consideration, including cost of service analyses, the impact of competitive energy sources such as

natural gas, the existing level of rates, and the desirability of making certain changes within the rate structures because of public relations, stimulation of the sale of electricity etc." He offered his opinion that "the distribution of various classes of customers is reasonable."

The report of the Commission had this to say: "With respect to the allocation of the total increase among the various classes of service, the Companies have improved the relationship of the class returns to the average return. Characteristics such as load factor and diversity change the level of return among the various service classes. Across-the-board increases cannot, in fairness, be continually sustained." With respect to the new tariff to be filed, which would produce additional annual revenues of $503,492 the Commission directed: "Rates to produce increases will be designed to provide class returns which more nearly approach the average return." As appears from the comparative ratios set out above, the rates as finally approved in fact carried out this directive.

In support of their contention that they will be compelled unreasonably to subsidize other classes of consumers the appellant companies have cited Welch, Preparing for the Utility Rate Case, *p.* 284, for the proposition that an equitable rate means one which will require the customer "to pay no more and no less than his fair share of the cost to the utility serving him . . . . " But the author goes on to point out that "this is a theory which is virtually impossible to translate into precise mathematical practice." *Id.* His following comment is also significant: "It is primarily the responsibility of . . . management, which obviously has more intimate knowledge and direct experience with the economics of its own business operations, to establish the various rate structures." "Unlawful" discrimination, in this author's judgment, comes in question only when there is "a demonstrable abuse of the managerial discretion in selecting or adjusting the rate structure in the first place." *Id.,* 285. See *Natona Mills* v. *Pa. P. U. C.,* 179 Pa. Super. 263, 271; *Boston & Maine R. R.* v. *State,* 102 N. H. 9.

In a similar vein, it is pointed out in Barnes, The Economics of Public Utility Regulation, that rate "planning" is needed not only to assure equitable allocation between classes of customers, "but even more to arrive at that scale of charges which will permit the utility to enlarge its market and achieve those lower unit costs

which are basic to rate reductions to consumers." Hence it is there concluded that "regulation should provide the company with opportunities . . . for experimenting with rate changes to determine that scale of charges which is in the best interest of investors and consumers." *Pp.* 333, 334.

The decision of the Commission in these proceedings expressly recognized characteristics which called for differences in the level of return among the classes. At the same time the decision effected greater uniformity among the classes of customers by directing a closer approach to the average of the returns paid by all the classes. This was accomplished in part by imposing all of the increase upon classes other than Class V. There was evidence on which these allocations could be found reasonable. The statutory presumption in favor of the Commission's finding that the differential in rates which persists is reasonable was not overcome by other evidence. RSA 378:10, 11, *supra.* Hence we affirm the Commission's order as it pertains to Class V consumers. *Chicopee Mfg. Co.* v. *Company*, 98 N. H. 5, *supra*, 21.

The order is

*Appeals dismissed.*

All concurred.