## 30664. ALLIED CHEMICAL CORPORATION et al. v. GEORGIA POWER COMPANY et al.

HALL, Justice.

This appeal is brought by certain industrial consumers of electrical power from an August 6, 1975 order of the Fulton Superior Court denying injunctive and other relief against utilization by Georgia Power Company, an electrical utility, of a certain rate structure. We affirm the superior court and rule that the challenged rates are not void as a denial of equal protection to the industrial consumers.

The rate structure was established by a December 13, 1973 order of the Public Service Commission in Docket No. 2465-U. The complaint alleged that the new rates effected a radical change in the relationship among different rates charged to different classes of consumers, and discriminated unjustifiably against the industrial class of consumers in violation of the equal protection guarantees of the Federal and State Constitutions. The complaint also attacked the rate level established in a related order of the commission, and this court, on interlocutory appeal related to that question, ruled that appellants did not have standing to raise a due process claim on grounds that the rates charged them were too high. *Ga. Power Co. v. Allied Chemical Corp.,* 233 Ga. 558 (212 SE2d 628) (1975). That decision recognized the applicability of equal protection guarantees, however, id., p. 559, and that is the basis for the present appeal.

The findings of fact of the superior court are set forth in the Appendix to this opinion detailing the history

and content of the challenged order and related orders. The claim before us, however, may be briefly placed in context and stated.

In its final order in Docket No. 2465-U, the Public Service Commission imposed a general rate increase on retail purchasers of electricity of $17.8 million, plus imposing a surcharge of a flat 1.345 mills per kilowatt hour on all electricity purchased, in such a way that the pre-existing rate structure was altered by raising the bills of residential users of power by about 6%, but industrial users by about 16%. The utility's retail customers may be divided into various classes: residential; commercial; industrial; and street and outdoor lighting. Appellants contend that before the challenged rate change, the actual differences in conditions of service to the classes required correction of rates to yield returns closer to the average rate of return of the retail system if they were to become more equitable; but the Commission in the new rates merely aggravated the pre-existing inequality. Specifically, before the increases, Georgia Power's rate of return for the total retail system was 7.03%; but the residential class returned only 5.68% while the industrial class returned 7.31%. After the increase, the total retail system returned 8.76%, the residential class 6.89%, and the industrial class 10.25%. The residential class thus fell further below the average, and the industrial class was raised further above it. Appellants argue that justice would have been served by the reverse; and this exacerbation of the discrimination is urged to be without rational basis.

Those are the facts by which appellants urge they have been damaged. Their legal argument has three parts. First, they contend that under a 1973 decision of this court there must be a well-defined method by which the Commission reaches its decision of what is a just and reasonable rate and this method must be capable of objective ascertainment; that the only well-defined method of which there is evidence in the record is a cost-based method (a cost of service study allocates the cost of producing electricity among the various groups which use it); that although rates do not have to be set strictly upon a cost basis, nonetheless they should

approach that as a limit, so that where some disparity exists among rates charged different classes of consumers considering conditions of service and costs therefor, any rate change must as a matter of law ameliorate the discrepancy instead of widening the gap, or else be condemned as a violation of equal protection. A somewhat oversimplified version of their argument is that a flat surcharge of so many mills per kilowatt hour is per se unconstitutional because it fails to give the industrial class users a price advantage commensurate with the lower cost per kilowatt hour of serving them rather than others. Appellants claim that the Commission avowedly did not follow a cost based method, and that testimony showed they considered certain non-cost factors which are not capable of objective ascertainment, and therefore as a matter of law the rates were not set by a valid method. Appellants suggest that the two basic issues before us are whether the difference in charges between industrial users and others is violative of equal protection because it is not reasonably related to a difference in service, and whether the Commission must follow a cost of services study in setting rates rather than being significantly guided by non-cost factors. We answer both questions no.

Appellants do not contest the right of the Commission to set rates so long as those rates are just and reasonable, nor do they deny that the Commission has the power to make reasonable classifications of its customers, and to fix a different rate for each class of customers, nor that the presumption is that the rates are valid and the burden is on appellants to prove them invalid in that they are unjust, unreasonable, or discriminatory. These principles have been extensively discussed in prior decisions, and are not challenged here. E.g., *Ga. Power Co. v. Allied Chemical Corp.*, 233 Ga. 558, supra (1975); *Carmichael v. Atlanta Gas-Light Co.*, 185 Ga. 34, 37 (193 SE 896) (1937).

Basically appellants' case is bottomed on one sentence from *Ga. Power Co. v. Ga. Public Service Comm.*, 231 Ga. 339 (201 SE2d 423) (1973): "We think that effective judicial review requires the commission to provide clear findings by a well-defined method or standard in reaching its conclusion as to what is a just and

reasonable utility rate." 231 Ga. p. 342. The flaw in appellants' argument is their overlooking the fact that the quoted sentence had application to the process of determining, not rates among various customer classes, but a fair rate of return to the utility itself vis-a-vis all its customers. The method involved in computing a fair rate of return is problematic, as the opinion indicated. 231 Ga. p. 341. However, business judgments and accounting expertise can handle the problem with a fair degree of objectivity. It is far more difficult to set differing rates among different classes of customers with anything like objectivity — this is a matter of policy and to some extent of balancing social needs and evaluating customer resources. Therefore, it does not follow that the requirement of a "well-defined method or standard" for setting rates with reference to a fair rate of return to the utility will be applied to the process of rate setting among different classes. There was no such requirement existing before the *Ga. Power Co. v. Ga. Public Service Comm.* decision, and there is none after it.

The process of setting rates is not required to follow any particular course, so long as the end result does not violate the "just and reasonable" requirement, as the United States Supreme Court has recognized in a federal rate-making case: "Under the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling. It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." Federal Power Comm. v. Hope Natural Gas Co., 320 U. S. 591, 602 (64 SC 281, 88 LE 333) (1943).

Therefore, appellants' contention that a cost-based rate system is the ideal toward which rate making must

always tend, is an oversimplification. It follows that their related contention, that the "modified cost of service method" (including some non-cost factors) does not exist as a well-defined method and the trial court erred in concluding that this "method" had been lawfully applied in setting the rates, becomes irrelevant, as does appellants' offering of three alternative rate-setting formulae which, they assert, are more objectively ascertainable than the one used.

Moving away from theory and considering the evidence actually presented to the Commission, appellants contend that it did not justify the new rates, because the only evidence presented concerned cost-based pricing. Of course, review of the Commission's order is by trial de novo, and the superior court was entitled to consider all the evidence before it bearing on the issue of how the rates were set. *Ga. Public Service Comm. v. General Tel. Co. of the Southeast,* 227 Ga. 727 (182 SE2d 793) (1971).[1] Because rate making is a legislative act, our test under an equal protection analysis of this economic regulation matter is whether there was a rational basis for the differing rate treatment of the complaining industrial class vis-a-vis other classes, and the rate must be approved unless we find it to be without a rational basis. *Ga. Power Co. v. Allied Chemical Corp.,* supra, 233 Ga. 558, 561, n. 4; *Ga. Public Service Comm. v. Atlanta Gas-Light Co.,* 205 Ga. 863, 883 (55 SE2d 618) (1949); *Southern Bell Tel. & Tel. Co. v. Ga. Public Service Comm.,* 203 Ga. 832, 870 (49 SE2d 38) (1948).

In justification of the rates, Commission Chairman Wiggins testified at the superior court trial that the Commission never proceeded solely on a cost basis, but traditionally considered non-cost factors. He said the new theory in regulation was that those causing the problem (the need for new facilities) should pay for them, and the

---

[1] Effective January 1, 1976, the laws governing the Public Service Commission were amended to provide that the Georgia Administrative Procedure Act should govern review of the Commission's decisions in certain instances. Ga. L. 1975, p.404 et seq.

Commission felt the industrial class, as the largest users, should bear the largest part of this burden.

Appellants call our attention to their Exhibit 12 which, they claim, shows that residential sales are increasing at a greater rate than industrial sales. Georgia Power objects that their increase figures are not facts but merely estimates. We note that they do appear to be estimates, but this fact is not alone determinative. Even if the figures were unchallenged, they do not necessarily contradict Chairman Wiggins. Exhibit 12 itself shows that industrial users are by far the biggest consumers of electricity. The old notions of rate making, which prevailed before the energy crisis, sought to maximize energy sales and encourage even greater energy consumption. Now that a true energy crisis is upon us, we would be surprised to find that this continues to be a goal. With energy now recognized as a scarce national resource, conditions might no longer exist for necessarily favoring large users with low rates. That, of course, is not for us to decide. We do decide, however that nothing in this record shows that it was unreasonable for the Commission to conclude that the largest users were primarily responsible for the need for increased facilities.

Appellants' own expert witness, Mr. Cecil, testified at length to the importance of the following non-cost factors: the historical relationship among rates — the residential class is usually below the retail system average and the commercial classes are usually above it; the ability to pay factor among the classes; the desire of the utility to promote certain types of timing of load and to discourage others in the name of conservation; the stability of the rate structure; its simplicity; the value of the service to the user. Moreover, though Mr. Cecil acknowledged his own bias toward cost-of-service rate making, he admitted this scheme must be altered by consideration of the non-cost factors; that weighing them was a matter of judgment and not a matter of cold arithmetic; that he was very reluctant to attempt to assign percentage values to the cost and non-cost factors in creating a formula.

Regulatory agencies traditionally consider non-cost factors in setting rates, and they are not required to

receive the same rate of return from all classes served. Northern Pacific R. Co. v. North Dakota, 236 U. S. 585, 598 (35 SC 429, 59 LE 735) (1943).

" 'Rates should be designed to hold existing business, promote new business, be just and equitable to the customer, promote good public relations and provide a fair return to the utility thereby making it possible to attract new capital to meet the industry's growth. No formula can be designed to attain these ends, but two basic factors must be constantly kept in mind—cost of service and value of service.'

"However, analyses of costs and studies of market-demand characteristics can take one just so far; ultimately, the setting of rates requires the exercise of experienced judgment." Garfield and Lovejoy, Public Utility Economics, 138 (Prentice-Hall, Inc. 1964).

"It is a generally accepted principle of public utility rate making that differences in the conditions of demand, as among the respective customer classes, indicate that each class has a different capacity and willingness to bear charges. Accordingly, with reference to value-of-service factors, rates are made so as to distribute the approved company-wide cost of service in relation to the capacity and willingness of the customer groups to bear such costs. More specifically each class bears the identifiable costs that can be associated with its service plus the portion of the joint costs that its demand characteristics indicate it can bear, while continuing to consume a satisfactory quantity of service. In addition, the operation of the value-of-service principle in utility rate making extends to the earning of different rates of profit from different classes of customers or service, within the framework of the over-all return approved under regulation." Id. at 143. See generally, Id., Ch. 10; Bonbright, Principles of Public Utility Rates, Ch. VII, Social Principles of Rate Making (Columbia U. Press, 1961); Phillips, The Economics of Regulation, Chs. 10 and 11 (Rev. ed. 1972).

The exercise of the judgment traditionally required in rate making is wholly inconsistent with appellants' argument that a method capable of objective ascertainment must be employed. Were such a method employed, our job on review might be easier; but we must

evaluate these rates in the light of what they *are*, not how they got to be that way. Georgia Power contends on this appeal, and the record shows, that the rate restructuring left residential users much as they were (their rate of return was 81% of the average retail rate of return before the new rates and 79% after); but it had the effect of eliminating the previous disparity between the commercial and industrial users, because the industrials moved up from 104% to 117%, while the commercials moved down from 122% to 118%. We cannot say that the Commission acted irrationally in electing to give residential users a price "break" of some dimension in the new "energy crisis" era, and for this to be done some other class must take up the slack. Nothing in the record shows that equalizing the commercial and industrial classes is irrational.

In short, the evidence before the court was adequate to show that the higher price assessed against the industrial class rested upon a rational basis which was reasonably related to legitimate ends of utility rate making. So long as this is so, it is no valid ground for complaint under equal protection principles that greater "fairness" might have been achieved through overhauling the rate system in a different manner. Railway Express Agency v. New York, 336 U. S. 106 (69 SC 463, 93 LE 533) (1949).

The main cases which appellants cite do not counsel a different result. Appellants argue that Public Service Co. of New Hampshire v. State, 102 N. H. 150 (153 A2d 801) (1959) squarely supports the conclusion that a prima facie case of undue discrimination has been shown. In that case, the contention was made that class V customers were unfairly discriminated against because they paid sums yielding to the company a greater rate of return than other customers. We note that the New Hampshire court approved the rates; but appellants argue that the New Hampshire Commission, unlike the Commission here, "expressly recognized characteristics which called for differences in the level of return among the classes." P. 166. We have studied that reported opinion, and although the court certainly used the quoted language, we find nothing before that court that constituted any "expressly

recognized characteristics" that are any more expressly recognized than the ones before us. The following portion of the opinion appears to detail all the evidence the court thought noteworthy: "In support of the tariffs originally filed in these proceedings, Public Service Company's research engineer described in detail the several classes of rates, and the proposed increases within each class. He testified that 'in designing the proposed set of rates a number of factors were taken into consideration, including cost of service analyses, the impact of competitive energy sources such as natural gas, the existing level of rates, and the desirability of making certain changes within the rate structures because of public relations, stimulation of the sale of electricity, etc.' He offered his opinion that 'the distribution of various classes of customers is reasonable.' " Id., p. 164. In short, the New Hampshire Commission did substantially nothing more to justify its differing rates among classes than the Georgia Commission has done on the present record, and that case does not suggest that the rates we consider are invalid.

In State v. Public Service Comm., 341 SW2d 795 (Mo. 1961), the court upheld the Commission's decision to assess lower rates against the industrial class than the residential class, because "there was much evidence" that the immense residential use of air conditioning was causing the need for new facilities. Not only does the record before us contain no such evidence, but the Missouri case simply shows the discretionary judgments which may appropriately be made by the Commission; it does not suggest that this discretion could not have been exercised lawfully any other way. Moreover, we must note here that the industrial class is already benefiting from discrimination in its favor. They pay a great deal less per kilowatt hour than the residential class; so although the rate of return to the company may be higher, the rates charged are substantially less than the charges to residential users. The evidence shows, for example, that in 1972 the industrial class consumed 41% of the retail kilowatt hours sold, but returned only 28.62% of the retail revenues.

Petition of Green Mountain Power Corp., 131 Vt. 284

(305 A2d 571) (1973) is inapposite because that court's conclusion that the rate design before it had no adequate footing in the evidence followed from the fact that the record showed only one witness, who himself said that his data was limited, and on some parts of the total new rate design there was no evidence at all. Finally, the statement in State v. Council of the City of New Orleans, 297 S. 2d 518, 524 (La. App. 1974) that "utility rate design . . . [should be] such that total revenue received will equal the costs incurred in providing services to the customers within the class" was made, not in the context of apportioning rates among service classes, but in holding unfair a late payment penalty that allowed a utility company "to attribute to the class of [late] rate payers costs for which they are not to be held accountable." Id.

Because appellants have failed to show that the challenged rate structure is without a rational basis, we will affirm the superior court's order denying relief. The motion of the Georgia Power Project to dismiss the appeal as moot is denied.

*Judgment affirmed. All the Justices concur, except Hill, J., who concurs specially and Jordan, J., who is disqualified.*

ARGUED JANUARY 19, 1976 — DECIDED APRIL 6, 1976.

*Sutherland, Asbill & Brennan, Michael T. Nations, Alfred C. Aman, Jr., Edward J. Grenier, Jr.,* for appellants.

*Larry W. Thomason, David Schlissel, Troutman, Sanders, Lockerman & Ashmore, Tench C. Coxe, Arthur K. Bolton, Attorney General, Robert J. Castellani, Deputy Assistant Attorney General, Heyman & Sizemore, Charles E. Campbell,* for appellees.

APPENDIX TO OPINION

II. *Findings of Fact*

1.

Plaintiffs Allied Chemical Corporation, Columbia Nitrogen Corporation et al. (hereinafter also referred to as "Industrial Customers") are users of electric power

supplied by defendant Georgia Power Company.

2.

Plaintiff-Intervenor Atlanta Labor Council, AFL-CIO, is an organization whose members are generally residential customers of defendant Georgia Power Company. Plaintiff-Intervenor John E. Wright is a residential user of electric power supplied by defendant Georgia Power Company. Plaintiff-Intervenor Georgia Power Project is an unincorporated association of individuals who are generally residential users of electric power supplied by defendant Georgia Power Company.

3.

Defendants Ben T. Wiggins, William H. Kimbrough, Robert C. (Bobby) Pafford, Ford B. Spinks and Mac Barber are the duly elected members of the defendant Georgia Public Service Commission.

4.

Defendant Georgia Power Company is duly organized as a public utility company under the laws of Georgia, holding exclusive franchise to furnish electric power in a major portion of the State of Georgia under the rates and service regulated by the Georgia Public Service Commission.

5.

On June 14, 1972, defendant Georgia Power Company made application, designated as Docket No. 2465-U, to the Public Service Commission to increase its rates for retail electric service so as to yield additional annual revenues of approximately $47.9 million. Defendant Public Service Commission suspended the effectiveness of those rates until December 15, 1972. Hearings were held in this proceeding between August 30, and November 13, 1972. On December 14, 1972, the Commission issued an order granting defendant Georgia Power Company a $17.8 million rate increase.

6.

On April 17, 1973, defendant Public Service Commission issued an order in Docket No. 2465-U accepting defendant Georgia Power's new rate schedules and denying the "Motion for Hearing in Nature of Adversary Proceeding to Determine Rate Schedule in the Event Any Portion of the Rate Increase is Approved," filed

on November 27, 1972, by the Atlanta Labor Council et al.

7.

On May 2, 1973, defendant Public Service Commission, upon reconsideration of its order of April 17, 1973, vacated said order, and set the issue of how to allocate the $17.8 million rate increase among defendant Georgia Power's customers for a special adversary hearing. The scope of the hearing was later expanded to cover the allocation of any rate increase authorized by the Public Service Commission in Docket No. 2536-U.

8.

On May 31, 1973, Georgia Power Company petitioned the Georgia Public Service Commission for a temporary emergency rate increase. This filing was designated Georgia Public Service Commission Docket No. 2532-U and after hearings on this matter, the Commission, by order dated August 7, 1973, authorized Georgia Power Company to increase rates uniformly by 1.345 mills per kilowatt-hour to all customers.

9.

On June 15, 1973, Georgia Power Company filed with the Georgia Public Service Commission an application to permanently increase rates to yield approximately $86 million of additional revenue. This filing was designated Georgia Public Service Commission Docket No. 2536-U and hearings were held intermittently during the months of September, October, and November of 1973.

10.

The adversary hearings on rate structure in Docket No. 2465-U, in which the plaintiffs and Intervenors actively participated, began on September 12, 1973, and were conducted during the months of September and October, 1973.

11.

On December 13, 1973, defendant Public Service Commission, by letter order, effective December 15, 1973, followed by a formal order in Docket No. 2465-U, also dated December 13, 1973, determined that the following different methods of allocating the rate increase (known as rate structure) among the customers of defendant

Georgia Power Company should be followed: (1) the rate increase granted defendant Georgia Power in Docket No. 2465-U should be allocated among its customers upon the basis of a 4.5% increase of rates for all classes of customers; (2) the revenue generated by the 1.345 mills per KWH surcharge granted in Docket No. 2532-U (approximately $43 million of the $67,884,000 increase granted defendant Georgia Power Company in Docket No. 2536-U) should be retained and built into the proposed rate schedules for the commercial, industrial and residential classes; and (3) the remainder of the $67,884,000 rate increase should be "apportioned equally among the residential, commercial, and industrial classes," and the rate increase within the residential class should be apportioned "in such manner that the customers using 250 KWH or less per month will experience an increase substantially less than the remaining blocks which will be increased on a graduated basis so that the highest users of electricity within the residential class will bear the greatest increases within the class."

12.

The practical effect of the order of the Georgia Public Service Commission in the rate structure proceeding was that the increase in rates authorized in Docket No. 2536-U which averaged 13.43% for all classes of customers was allocated to Georgia Power Company's three primary classifications of customers by applying an increase of: 11.93 percent for the residential class; 11.89 percent for the commercial class; and 18.11 percent for the industrial class.

13.

On December 21, 1973, Allied Chemical Corporation et al. filed a petition for rehearing, reconsideration, and oral argument with defendant Public Service Commission. On January 15, 1974, said petition was denied by the Public Service Commission. On January 24, 1974, following publication of the Public Service Commission's formal order in Docket No. 2465-U, dated December 13, 1973, Allied Chemical Corporation et al. filed a supplement to their earlier petition for rehearing, reconsideration, and oral argument. On

January 29, 1974, said supplement was denied by the Public Service Commission.

14.

The issue of whether Georgia Power Company's rate structure should be modified was set down for a specific adversary hearing in Docket No. 2465-U. The starting point for any analysis of an electric utility's rate structure is generally regarded to be the preparation of a cost of service study, which shows the allocation of the utility's costs among its various customer classes.

15.

Defendant Georgia Power Company placed in evidence in Docket No. 2465-U an allocated cost of service study, based upon the peak responsibility method, using data for the calendar year 1972. Costs were allocated to each customer class on the basis of the demand placed upon the company's system at the time of the system peak load. This study accurately reflected the relative rates of return earned by Georgia Power Company from each of its customer classes. The study reflected the following results:

|  | Rate of Return |
|---|---|
| Total Retail System | 7.03% |
| Total Electric System | 7.08% |
| Residential Class | 5.68% |
| Commercial Class | 8.61% |
| Industrial Class | 7.31% |
| Street and Outdoor Lighting | 9.57% |
| All other service | 7.35% |

This table shows that the rate of return of the industrial class was slightly higher than the retail system average, the rate of return of the residential class was substantially below the retail system average, and the rate of return of the commercial class was substantially above the retail system average.

16.

An electric utility's customers are divided into different classes for rate structure purposes because there are distinct differences among the various classes of customers in their general usage patterns, which result in significant differences in the costs involved in serving

such customers. This is the basic premise in the "cost of service" method of pricing. The fixed costs on a unit basis (per kilowatt-hour) generally decrease as the size of the utility customer increases. This is so because a smaller investment per kilowatt-hour is required for the larger customers than for the smaller customers. The Georgia Power Company cost of service study revealed that, in 1972, industrial electrical consumption was 31.8% of the total consumption by all classes of customers, but the investment required to serve the industrial class was only 18.293% of the total, and the expenses required to serve the industrial class were only 24.355% of the total. On the other hand, consumption of electricity in 1972 by the residential customer class accounted for only 22.8% of the total, whereas the investment and expenses figures for the residential class were respectively, 37.761% and 31.747% of the total.

17.

As a result of the Commission's order of December 13, 1973, in Docket No. 2465-U and 2536-U, rates for Georgia Power Company's entire system were:

|  | Rate of Return |
|---|---|
| Total Retail System | 8.76% |
| Residential Class | 6.89% |
| Commercial Class | 10.30% |
| Industrial Class | 10.25% |
| Street and Outdoor Lighting | 9.99% |

18.

In Georgia Power Company's application in Docket No. 2536-U, in which it requested a rate increase of approximately $86 million, the Company proposed to retain its historical rate structure and to spread the rate increase among its customer classes on the basis of an across-the board percentage increase. The Commission's action, however, with respect to Georgia Power Company's rate structure in Docket No. 2465-U skewed the rate increase of approximately $68 million in a different fashion and resulted in a higher rate increase for all except the smallest industrial customers served under Georgia Power Company Rate Schedule I-3 than they would have experienced had the Commission granted the

entire $86 million rate increase requested by Georgia Power Company, but divided among the company's customer classes on the basis originally proposed by Georgia Power Company in its application.

19.

The change in Georgia Power Company's fuel adjustment clause from a twelve-month computation to a three-month computation prescribed by the Commission in its December 13, 1973 order in Docket No. 2465-U was a factor which partially resulted in a sharp increase in the amount of Georgia Power Company's fuel adjustment charges during the early part of 1974. This, combined with rapidly escalating fuel costs caused very substantial increases in the monthly bills of Georgia Power's customers, particularly its larger industrial customers.

20.

In February, 1974, Georgia Power Company filed new rate schedules in order to comply with the Commission's orders of December 13, 1973 in Docket No. 2465-U and 2536-U. These rate schedules were adopted and authorized by the Commission.

21.

During the past 10 years the consumption of electricity by the residential class has increased on the average of 11.20% annually, commercial consumption has increased an average of 12.32% annually, and industrial consumption has increased an average of 9.52% annually. (See T. R. 2465-U, 352—53). From 1972 to 1973 residential consumption of electricity (in kilowatt-hours) increased 11.6%, commercial consumption increased 10.7%, and industrial consumption increased 7.7%. The demands (in kilowatts) at the time of Georgia Power Company's system peak, increased from 1972 to 1973 for the various customer classes, as follows: residential, 185,400 KW; commercial, 189,853 KW; and industrial, 125,945 KW.

22.

At the trial before this Court, Chairman Ben T. Wiggins of the Public Service Commission testified concerning the basis for the Commission's rate structure order in Docket No. 2465-U. He cited certain non-cost factors upon which the commission relied in

promulgating its rate structure order mentioning, particularly: (1) ability to pay, and (2) that those users causing "the problem," namely, the need for expansion of Georgia Power Company's facilities, should bear the major burden of paying for them. These are sometimes referred to as historical, societal or political factors. He testified that he thought it was the industrial class of customers that were creating the need for new facilities, more than the residential and commercial classes.

HILL, Justice, concurring.

I concur in the judgment of affirmance. I am unable to concur in the statement of the majority that "Of course, review of the Commission's order is by trial de novo... *Ga. Public Service Comm. v. General Tel. Co. of the Southeast,* 227 Ga. 727 (182 SE2d 793) (1971)."

The Public Service Commission is a constitutional body created for the regulation of public utilities and vested with the jurisdiction, powers and duties provided by laws enacted by the General Assembly. Code Ann. § 2-2703. The Public Service Commission established the rate structure here in issue after hearing testimony which required 1,002 pages to transcribe.

As the majority opinion recognizes, rate-making is a legislative act. Yet here the superior court reviewed the Commission's order by trial de novo. The matter was heard de novo apparently with the consent of the parties. In any event, no enumeration of error has been directed to this point, and hence I concur in the judgment of the court.

However, for the reasons stated in *Statesboro Tel. Co. v. Georgia Public Service Comm.,* 235 Ga. 179 (1) (219 SE2d 127) (1975), decided after entry of the order of the superior court here on appeal, I do not believe that *Ga. Public Service Comm. v. General Tel. Co. of the Southeast,* supra, requires trial de novo by the superior court of every order of the Public Service Commission.

In my view, the Public Service Commission is vested by the Constitution with jurisdiction of utility rate-making. In my view, utility rate-making should not be subject to trial de novo by the superior court. Trial de novo is not required by law (*Statesboro Tel. Co. v. Ga.*

*Public Service Comm.,* supra), and is unmanageable in practice. See my concurring opinion in *Ga. Power Co. v. Allied Chemical Corp.,* 233 Ga. 558 (212 SE2d 628) (1975). In recognition of this, the law has been amended so as to eliminate such trials de novo. Ga. L. 1975, p. 404.

By Ga. L. 1975, p. 404, the Public Service Commission was partially placed under the Administrative Procedure Act. The APA provides for review of agency decisions by the superior court. Code Ann. § 3A-120. Because the APA provides a remedy for review, there is an adequate remedy at law and hence suit in equity is, in my view, no longer an available remedy for review of the Public Service Commission's utility rate-making decisions. That is to say, in my view Ga. L. 1975, p. 404, had the effect of overruling the second division of *Ga. Public Service Comm. v. Atlanta Gas Light Co.,* 205 Ga. 863 (55 SE2d 618) (1949).

The purpose of this concurring opinion therefore is not to urge a change in the law governing rate-making but is to urge caution in requiring trials de novo from decisions of governmental bodies where the only means of reviewing such decisions is by a suit in equity in the superior court.